Mr. Riggle, please proceed. May it please the Court, I'm here today on behalf of my client, Tianjin Magnesium Int'l, we refer to them as TMI for short. That's not a very flattering acronym, right? Doesn't that mean too much information in the texting world? It's an easy way to do it, rather than having a long name that you have to do all the time. Three issues for this Court's consideration. The first is whether the interlocutory decision of the Court of International Trade, which remanded the case indicating that adverse facts available was warranted, usurped the due deference, which is a courted decision of the administrative board. Could you start by addressing why the arguments you're making on appeal today aren't raised, given that they weren't raised below? Sure. The trial court judge indicated unhappiness with the argument of the plaintiff during a hearing, along with other indications. This suggested it could be dangerous to present an argument to this particular judge in this case at that time, and thus a decision was made to not do it and go on the administrative record. The fact that you might irritate a judge while making your record doesn't excuse you from making a record, does it? It does not, Your Honor, but there were particular facts in this case that made it rather sensitive. In fact, the trial court judge later disqualified himself from the case on the basis that his impartiality might be reasonably questioned. Are we supposed to set down a standard that says that when you don't raise an argument at a time that you should, and that we're going to look behind the personal relationships between the judicial officer and the party when there's been no allegation of conflict, there was no motion to recuse? I mean, I think you're putting us in an awful difficult posture. This court has full, the noble power of review, and this is the sort of case that demands such oversight, we believe. And that's why we're here today, looking for some relief for our client on what we think was an incorrect decision below by the judge. So even if you can get past waiver, you started by saying you thought that the remand was improper, but what part of that order actually constrained Commerce in terms of what they could decide? There was a remand for additional consideration, but there was no directive as to what the decision should be. There was no directive, but there was a very strong indication that adverse facts available should be used in the interlocutory decision. And this strong decision influenced the Commerce Department to change its decision in the remand from what it originally did. In the original decision, they calculated a rate based on the information of record and simply did not use the information that they found to be tainted. Well, you don't actually know that. I mean, Commerce argues that, in fact, the only thing it was constrained to do was to reconsider with this additional factor involved, and they made their own decision. They made their decision, but the decision was very strongly indicated by the judge's decision, we would argue. And if you look at the decision, you see right up in the front of it that the judge says, Court concludes that the Commerce's decision not to apply total adverse facts available to Tianjin was not supported by substantial evidence. That's right up there. That's not a directive, but it's a pretty strong indication, I would argue. But it ultimately required, that actually required no more than give me a better explanation or rethink it. It didn't say you must apply the provision that permits drawing of an adverse inference. The Commerce Department gave a very strong indication of their reasoning originally. If you look at our brief on pages 19 through 21, we've quoted verbatim the whole justification originally for not using adverse facts available. For the Department to flip-flop completely on remand indicates that there was something more than just their feeling on this. It's a complete change from using the data that they believed was verified on the record, in information that was verified in an almost three-week verification in three locations in China, reviewing tens of thousands of documents, plus all of the knowledge that the Department had in this case, what it built up over the time. The question is, is whether TMI was fully cooperative, and the Department said yes, except for this one issue with regard to the unrelated supplier, it was cooperative. And this was, I said unrelated, I meant unaffiliated. With the unaffiliated supplier, that was the only issue. Furthermore, the Commerce Department also, the judge also sent this back to the Commerce Department, and the Commerce Department did not consider that there was another company, another supplier involved. There was an affiliated supplier in which there was a rate calculated. But in the final remand, they calculated one rate applied to both products of the affiliated supplier as well as the unaffiliated supplier. We argue that that is wrong. There should have been, at the very least, a separate rate for the affiliated supplier's supplies. We already affirmed that rate in a review that had occurred only a year earlier. So what changed in a year that would dramatically alter the appropriate rate? Every review is on its own, and the rate is calculated review by review, based on the factors of production and the sales data. And the information of record indicated in this case, as originally calculated, That's my question. What was really different in terms of the information of the record from one year to the next? In these China cases, there are two things that are important. One is the factors of production, and the second is the surrogate value. And the surrogate value that is used every year can dramatically change the rate for no reason other than it's a different surrogate value from year to year. Okay, but what facts would give rise to application of a different surrogate value? In each review, the Commerce Department selects the country mix, usually six countries, surrogate countries, and then the parties supply surrogate values for one or more of those countries. The Commerce Department then selects one of the countries, typically, to apply the surrogate values to the data. There are cases, in fact, in a previous review of this case, another review of this case, where the Commerce Department used a financial ratio that totaled about 89%. The profit ratio in that case was around 50 or 60%. Don't you wish you had stock in a company like that? It's a very odd rate. So I take it you're not going to answer my question? What facts, I mean, we know how this works. My question is, what facts for the year 2007-2008 differed from the facts for the following year? The facts in this year are they used the data for this year. In the previous year, the Commerce Department found applied adverse facts available for a completely different reason. In this one, the trial court judge seemed to believe that the fact that you had adverse facts in one review, that it should be applied in a separate review. You're relying on the same document, the same tainted document. Didn't you resubmit the same exact document in the 2009 review? The Commerce Department asked to review them at verification. It would have been fraud to have changed those documents. Well, actually, no, they were fraudulent to begin with. So I'm not sure how fraudulent squared really works into the whole calculation. But in any event, I mean, wouldn't it have been appropriate to submit the document and to at that point admit that these are the documents you requested. However, these documents cannot be relied upon because yada, yada, yada. I mean, just because you were held – I feel like this isn't the case which you're trying to make it now, which was, look, we did something wrong and we were penalized for it in certain years. But then in subsequent years, we did it all right and we already paid our dues. Don't throw us back in prison a second time. We haven't done anything wrong. But the problem is you did. You then resubmitted those same false documents in 2009. So I'm not sure what exactly your argument is. The documents were not submitted as part of the question and answer process. Rather, they were documents that during the verification the Commerce Department asked to review and they made the connection during the review of the unaffiliated supplier that these documents – in order to perform their review, correct? While they were on site in China, yes. Okay. So they asked for the documents because they were necessary for Commerce to be able to figure out what ultimate rate ought to apply in 2009. You gave them those documents which were falsified or fraudulent or however you want to explain it. I guess I don't understand why it was then problematic for them to apply adverse facts in 2009 as well. The overall information in 07-08 could not be relied upon because they could not review all of the information. In this case, they reviewed all of the information. They found that certain documents with regard to offsets were not reliable. And they calculated a rate because they just refused to use those, but they could use all of the other information for material inputs, financial ratios, et cetera. Well, is there any precedent you can point me to that suggests that for adverse facts it isn't proper, for example, for Commerce to use adverse facts despite certain falsified data when there is other data in the record they could have used? I mean, I'm just trying to understand whether the adverse facts here is being used as a punitive sanction maybe. Is that what you're trying to argue? I'm trying to appreciate the distinction because there were falsified fraudulent documents submitted here. So I'm just trying to understand how you're distinguishing why they shouldn't result in adverse facts in this case. To segue into the next part of my argument that if adverse facts are to be applied, then the 111 percent rate was simply not appropriate. The Commerce Department actually calculated a rate of .8 percent for the sales in this case. I think we have that argument really well in your brief, and you are eating into your rebuttal time. If you want to keep going, I'll let you do it, but if you would like to save the remainder, it's up to you. Oh, I will save the remainder. Thank you. Ms. Burke, you have 10 minutes, but it shows 15 on your clock. So when you get to five, if you don't stop yourself, you're eating into the other counsel's time. Okay. Thank you. May it please the Court, Commerce's remand determination should be sustained. First, TMI waives its arguments before this Court on appeal. TMI is essentially challenging the results of the remand determination, and since Commerce changed its determination, all of the perceived or alleged errors along the way are subsumed in that new determination. That is what's on appeal. I wasn't quite sure about that as a procedural matter. This sort of thing must come up in a lot of different contexts, so I assume there's an answer. When an agency is brought to a court, the court says, think about it again. The agency, in thinking about it again on a remand, says, we now change our mind. And then it goes back to the court. Can the challenger say, when it eventually goes on appeal, that the court's first ruling saying, think about it again, was improper, and if that was corrected, there never would have been an agency change? I don't know that it matters here, because you have an argument that the first ruling, the May 2012 ruling, was correct, because all it did was say, give us better reasons or rethink it. But as a procedural matter, why are they either barred from making that argument, or why do they have to? It seems utterly pointless for them to renew it the second time in the CIT, as opposed to the challenge to the second Commerce order. Well, I agree that it doesn't matter, but if you look at the court's decision in Tung Mong, it was clear, this court was clear, that in this kind of a situation where there's been a remand, and Commerce changes its determination, that a perceived error in the remand order is irrelevant. Because the agency has changed its mind, and the only thing that's on review at that point is the agency's determination. Were you counsel below? I was not. Do you know anything about this supposed animosity between the lower court and TMI? I'm familiar with what went on at the Court of International Trade, yes. And TMI's allegations. Do you agree that the judge was so hostile to their position that he essentially sent the message that they shouldn't file, or shouldn't object? No, I do not agree with it. This is the first that I'm hearing of that particular allegation right now. It's true that some procedural aspects before the Court of International Trade are certainly unusual, and I think the court would recognize that if it went through the docket. However, I do not agree that the Court of International Trade indicated in any way that it would be hostile to any kind of appeal on this issue. And in fact, when TMI asked for more time to file comments on the redetermination, the Court of International Trade granted the motion, and then TMI just didn't file anything, and then filed a motion for reconsideration, essentially just challenging the results of the redetermination, and not saying anything about the remand order. I can't speak for the Court of International Trade, but there's nothing unusual about a party complaining about a court remanding to an agency. So I don't think that there would have been any problem with it whatsoever, no. Getting to the merits, to the extent that the Court determines that TMI has not waived its argument, the Court of International Trade did not dictate to Commerce what to do. The Court of International Trade, in fact, gave Commerce a recipe for how to continue not to apply AFA with a reasonable justification based upon substantial evidence. What happened on redetermination is that Commerce obviously, I don't know if it decided that it couldn't justify its choice not to apply AFA, but regardless, it changed its mind. Whether or not it felt that the Court of International Trade had any particular feelings or was suggesting that, I think is beside the point. Commerce is pretty clear that it changed its mind. And in fact, if you look at the remand, it didn't address some of the questions posed by the Court of International Trade because it changed its mind. The Court of International Trade, again, gave Commerce a chance to stick to its guns, but with support in the record. And Commerce chose instead to go the other direction. And as the Court is aware, Commerce is not shy about sticking to its guns when it thinks that its original determination is correct. As between the 2007-2008 period where we affirmed this same rate and this period, do you see material differences of fact between the two periods? There are certainly differences. So, for example, in the previous review, the verification during the previous review was, of course, the event that set all of these cases in motion. And during that verification, there were all kinds of bizarre things that happened. And as the Court pointed out in its remand determination, and as Commerce acknowledged, I think, in both its original determination and its remand, all of that crazy behavior, that didn't happen here. This was a much more civilized procedure, a much more civilized verification. However, TMI continued to submit documentation that had already been determined to be falsified. And so, although the factual circumstances were different, when they submitted it the second time, it had already been determined to be falsified? No, it had already been determined to be falsified. It was several months later. There's a little bit of disagreement about how many months later, but it's between seven and nine months later. Arguably, this is actually worse because TMI was aware of what was going on. Arguably, the first time around, TMI was subject to the whims of its producer, and the producer was stepping into TMI's shoes now. Perhaps the producer wasn't telling TMI that these documents were falsified. I don't know, but in this instance, TMI knew that they were falsified and continued to submit them. Can you address the version that I think I took from Mr. Riggles' argument that submit here can mean a number of different things? He painted a portrait of not taking the initiative to present the documents to Commerce without qualification, as if without implied representation that they were accurate, but rather Commerce said, please give us these documents. And Jen said, okay, here they are. What happened? I'm happy to place it in context because it's important to remember that TMI is producing documents for purposes of this issue because TMI is requesting special treatment. TMI is requesting an offset, and that's something that a party requests. It's not something that Commerce just gives you. So TMI, in this instance, requests an offset. Commerce says, okay, if you want an offset, then you need to give us the documentation. So I think what my opponent is trying to say is that Commerce asked for documentation to support the offset. Commerce did not ask that TMI submit false documents. Did Commerce ask for TMI to submit these documents? No. Just any documents that you think support? Yes. That's exactly right. What I was asking before, though, is not the differences between the two years for purposes of deciding if adverse effects should be applied. The question I had is the differences between the two years in terms of calculating the rate. So determining the surrogate, precisely calculating the rate. Are there differences between those two years or were essentially the facts and the factors used to calculate the rate the same? So I think I probably agree, carefully agree with TMI's counsel that the surrogate values, they have to be different because they were even different between the preliminary determination and the final determination here. So I assume that there were other issues in this case. Financial ratio issues, surrogate value issues, all of those would go into the dumping margin. And yes, there are always differences between the two reviews. But those differences still resulted in the same rate? Well, I don't think TMI was ever calculated a rate in the prior review. So in the prior review, this adverse facts available issue was, again, this is when it really came up. So I don't think that Commerce actually got that far that it calculated the rate. I think the last time TMI got a calculated rate was in the first of these three reviews, where Commerce also went back and reapplied AFA after it realized during the middle review what had happened. We are close to the end of your time. Do you have a final thought? Thank you for reminding me. I would have forgotten. Thank you very much. May it please the Court. We respectfully request that the Court sustain Commerce's re-determination. Thank you. Mr. Denning? Thank you, Judge Moore. Good morning. May it please the Court. I think I'll begin with your questions, Judge Malley, concerning whether there are differences between the 2070 review and the 2008-2009 review. There are two differences. First, one of the differences has already been clearly pointed out, and that is that in the 2070 review, there was submission of considerable falsified information, but there was no finding during that review that TMI knew that the information was false when it submitted it to the Department of Commerce. In the 2008-2009 review, just like the 2006-2007 review, which also has been through this Court, there were findings. It was clear that when TMI submitted the information that it submitted, sometimes in response to questionnaire responses, sometimes in response to questions from the Department, TMI and counsel certified the accuracy of that information, and they knew it was false when they certified it. So the key difference between the two reviews is that in the 2008-2009 review, TMI submitted voluminous falsified information, and it knew it was falsified when it submitted the information to the Court. Now, in terms of differences in the way the margin was calculated, in the 2007-2008 review, TMI had a single supplier. In the 2008-2009 review, it had two suppliers. The fact that there was a second supplier, however, the affiliated supplier that we heard about earlier, is irrelevant for two reasons. Affiliated, not unaffiliated? There were two suppliers. One was affiliated, and one was unaffiliated. In both reviews, both of the sales concerned merchandise that came from the unaffiliated supplier. In the 2008-2009 review, the information that was provided by the unaffiliated supplier and the affiliated supplier was all rejected by the Department. So the fact that there was a second supplier really doesn't make any difference in terms of how the Department is going to get around to calculate margins, because in the redetermination, the Department decided that everything that TMI had submitted, including TMI's once verified sales information and once verified affiliated supplier's cost information, all of that was rejected. So by the time the Department got to the point of picking an adverse facts available, deciding what to do with TMI's misconduct, it had, in both proceedings, rejected all of the information that was on the record. There was no information on the record from which it could calculate margins under any circumstances, because all was found to be unreliable. And the reason Commerce made that determination, the reason why Commerce decided that information that we have verified, we are now rejecting, is because when it looked more closely at the submissions during the redetermination phase, it saw that there were voluminous submissions, including responsive submissions, that contained information that was false, that was known to be false, but it was certified under certifications of accuracy. Commerce was very concerned with submission of information where the submitter says, I certify this is accurate, when they knew it was not. So Commerce said, because TMI has submitted extensive documentation, claimed it to be accurate, but it is not accurate, we have elected to reject all of the information on the record. Now that really is not an unusual decision for the department to make. Typically in an administrative proceeding when the department sees that a respondent has submitted falsified information, not necessarily extensive falsified information, just falsified information, it will elect to reject all of the information submitted by the respondent because it just cannot find a basis, it can't have a reason on the record to rely on any of the information submitted. Even if it could verify the other information? It went through a verification process. That's the difference here, right? I understand Commerce saying, okay, I can't rely on anything you said because a bunch of what you said is clearly falsified. However, in this instance, Commerce did verify the other information on its own first, distinguished the false information. Why then is it okay to use the adverse facts in such a Well, first, I don't believe that adverse facts available is punitive in this case, but Commerce did verify TMI's sales information and TMI's affiliated suppliers' factors of production information. It went through the process of verification and wrote a report. And then in the redetermination  with the sales information, the affiliated supplier information, it decided that there was such extensive fraud in the record that it couldn't be sure that the verification that it had conducted really came to accurate results. And it decided in its expertise, Commerce is the agency that is charged with administering this complicated law, going to foreign lands, conducting verification. In its expertise, it said, we cannot rely on this. This is so unusual to have such extensive falsified information that's certified under claims of accuracy that we're just going to reject all of it, even though we went through the verification process. Verification is just a spot check. The department decided in essence that the spot check that it conducted in this instance because of the extensive falsified submissions was no longer reliable and it exceeded your time. I'll give you maybe 20 or 30 seconds to wrap it up and turn to what you want to turn to. During the trial court phase, I'm counsel for U.S. Magnesium, we made it very clear to the trial court judge the extensive submissions of falsified information. We brought in an appendix containing all the falsified documents. It's voluminous. It's pages 202-118 to 202-404 of the supplemental appendix before this court. All of those documents were falsified. During the hearing and in briefs filed to the trial court, TMI continued to argue as if there was no falsity below. It said this is all about a matter of proof. It was not about a matter of proof. It was about a matter of submission of falsified documents and the trial court judge was very uncomfortable with arguments being made in briefs filed before the trial court that were false, that were known to be false and a failure on TMI's part to recognize that it had been caught submitting extensive falsified documents. I don't think that it's fair to say that there was hostility at all. I think it was a recognition of very unusual behavior that the court addressed during the oral arguments in the trial court phase. Give Mr. Riggle a chance to have his rebuttal and let's please add two minutes to Mr. Riggle's rebuttal time so that we can keep the time even. If you need extra time, add two minutes. Thank you. Let me just begin by reiterating that the trial judge involved in this case actually disqualified himself in the case and I will say no more about that. With regard to whether or not TMI was arguably aware and also the definition of the word submitted, this actually doesn't show up in the record. The record talks about a voucher book. There actually was a single document in a voucher book during the verification. This is one of tens of thousands of documents. The TMI does not control this unaffiliated supplier and cannot vet all of the data beforehand. It has to rely on the supplier. The offset is a small matter in terms of value and it was not a matter that TMI spent a lot of time on. They want to get the big issues because that's where the money is. With regard to the rate, the rate should have some relation to an actual rate. Use the data of record. TMI was calculated a rate in 05-06 of zero. You asked me about 07-08, but in a previous review it had a zero. It had a calculated rate of 0.8 in this. Whether or not the rate applied here of 111% is punitive, I'll let you decide that. I certainly would argue that it is compared to the actual rates that have been calculated for TMI in both this case and in the other case. This is not reliable data of record in which to calculate a rate. This is the affiliated supplier's data, which is not discussed anywhere in the opinion or by the Commerce Department and why they did not. The defendant intervener argues that it's a small amount. The amount doesn't matter. There's no dispute that there was bona fide sale. There's reliable data on the record. A rate could be calculated for that. Unless you have a question, I will end it there. Thank you.